Thank you, Your Honor. May it please the Court, I'm Mark Weintraub from the Federal Defender Office. I represent the appellant, Jason Conley. At essence, our Fourth Amendment issue in this case is about two things. It's about a front door and a closet. And that leads to the two points I'd like to make. A broken door and a small closet. A broken door and a small closet, that's right. There are two points I want to make with respect to those two facts. First, with respect to the front door, the issue is, was it objectively reasonable under these circumstances, under the circumstances of this case, to believe that entry of the house was necessary, that needs of law enforcement were so compelling that law enforcement was justified in going into that house without a warrant? Now, the second point, how long, what does the record show about the amount of time that expired between the time when Mr. Crenshaw purportedly saw someone forcefully enter the residence and when Officer Randleman first approached the house after talking to him? This all happened beginning at 2 o'clock in the afternoon on January 25th. 2 o'clock was when Officer Randleman was dispatched to the house around the corner on Tangent Street. On his way driving to that house, he passed the house at 146th. Now, that was about five minutes before Mr. Crenshaw came and reported to him. Now, that five minutes before is when he saw the two women coming down the front steps and leaving. Five minutes later, Mr. Crenshaw speaks to him about having seen someone force his way through the door. Now, that would have been at 2.18 p.m., according to the police logs, and they're reflected in the excerpt of record at ER 102. At 2.24, I'm sorry, at 2.18, Officer Randleman was speaking with the next-door neighbor. At 2.24, Crenshaw spoke to him. At 2.25, Mr. Conley was already being detained at gunpoint. So it was fairly— It happened within minutes, and those times come straight out of the police logs. So where do you think the weak points are? There is a tipster, but— I'm sorry? Where are the weak points in the probable cause to go through the door? I mean, you have an officer on scene who was told by a passerby that he'd just seen somebody break into the front door, and he goes around and sees a broken front door, and it's a prop shot. Nobody answers. So what— With respect, we're not— —to think under those circumstances. With respect, we're not arguing probable cause here. We're arguing whether there were exigent circumstances that justified going in without a warrant, assuming that there was probable cause. And that leads me to my— What was the probable cause, then? If you're conceding probable cause, what was the probable cause? We're not conceding probable cause. So we're not talking about probable cause. You're assuming probable cause. It's exigent circumstances. So are you suggesting that— What are you suggesting, then? I'm saying that there— I'm saying that police erred in two respects. First was when they went through the front door without a warrant. The second was once they were inside, that they continued their search after they found Mr. Conley. Police officers are standing confronted with a broken door, a jar, which is prop shot by—partially closed by a reclining chair. I think an objective person would say somebody had to put that chair there. It was inside the house. I believe the beginning— the beginning of an answer to the Court's question is to look at the standard because the standard has changed since we— since the hearing in this case about a year ago and since we filed our brief last spring, the Supreme Court issued its decision in Brigham City, which I believe does alter the standard. When we had the hearing, our focus was on what these police officers knew, what these police officers intended when they went in. Brigham City says that that was the wrong focus, that instead our focus should have been on whether the circumstances viewed objectively justified the entry. In other words, would a reasonable police officer, given all of the apparent circumstances here, have been justified, regardless of what these two officers knew or intended? And given that standard, I believe it's then fair to take a look at all of the circumstances, beginning with what these police officers did know and see, second, what was obvious to them, whether they knew it or not, and third, what they reasonably should have known, given what was common knowledge within this small town and small police department. Now we can begin with what they did know. They both had been to 146th Street before. They knew the house. They had both been involved in arrests there before. They knew that there was no noise coming from inside the house. They could see through the gap in the door and could see there was no activity going on inside. They sort of omitted a crucial fact, which was somebody had tipped them that they'd seen somebody through the door. I was getting to that. They knew that there was a report of one person going through the door, a single person, and I believe that's critical here. A counselor was breaking into the door. Now they get there and the door is crocked shut. Mr. Crenshaw testified that he wasn't positive what he told the officer. He also wasn't positive what he saw. But what he recalled seeing was that someone had opened the door either by kicking it or by using a shoulder. Okay, so now it's getting a little fluid here. You said we're supposed to look at the totality. Now you're citing a factual dispute. Well, that's the first. The officer was that what he was told, what he heard, was that somebody had broken in through the front door. The place to start is with what they knew. But then let's take a look at what they could see, whether they knew it or not. And the court has these exhibits in the excerpt. Exhibit 19, which is at 209 of the excerpt of record, is a series of photographs of the door. And part of the totality of the circumstances here is that police officers could see that the damage to this door was not fresh. Well, they knew it wasn't. They knew that house as well as they knew the local donut shop. They knew that house pretty well, although they did not acknowledge knowing about the previous damage. But their department certainly did. The record shows that 20 days earlier, this police department had kicked in the door to go in and arrest someone who was in the bathtub in violation of a restraining order. Are you saying, Mr. Weintraub, that these particular officers knew or certainly should have known everything that happened within the town, anything that the police department had done? I'm saying that a reasonable police officer in these circumstances with this house should have known the recent history of this house. What do you base that? I base that on the Brigham City Standard that says that it's an objective standard, that we're looking at what a reasonable police officer objectively viewed would have done. Now, only less than 48 hours before, there had been a report to this police department about the damaged door. There had been a call just before midnight the previous day about a dog barking and a door that was damaged and wouldn't open properly, and that's in the excerpt at 166. Sergeant Martinez, who was in charge at the scene once he got there, said that it was part of his job and that he routinely reviewed those logs when he went on duty, although he had no specific recollection of reviewing that one. Now, if we're looking at what a reasonable officer should have done, I believe it's fair to take that into account. Now, I'd like to move on briefly just inside the house, because let's take this totality of circumstances and let's assume at least — Just one second, Mr. Weintraub, because you have submitted some additional information on the 28J letter, and I wanted to — He wants to get to the clause, and I'll give it to him. Oh, okay. Very good.  Very good. I just want to say this about once the police officer were in the house. They knew that one person was reported to have gone in. They knew Jason Conley. One of them knew Jason Conley personally. They found Jason Conley in the bedroom sitting on the mattress. They asked him whether he had permission to be there, and he said yes. They did not ask him, interestingly enough, whether he was the one who had been seen going through the front door. Next to Mr. Conley on a table right by the mattress was a note that said, Jason, we went to take a shower, signed Heather. They knew that Heather was one of the residents. They did not acknowledge him seeing the note, but it was right there. Now, again, under the totality of these circumstances, I would submit that it was unreasonable to go further at that point. Once they had identified Mr. Conley, just as in the Murdoch case, which we cite in our briefs, they should have stopped there and not gone further with their search. If the court has questions and I have leave, I'll come back during. You can answer the question, your 28-J letter about this. Yes. Specifically, I wanted to know, you cited in your letter Fernandez-Ruiz versus Gonzalez. That's correct. And I wanted to know how you believe that applies to this case, that Fernandez-Ruiz dealt with predicate offenses in an immigration context, whereas this case involves predicate offenses in connection with a felon in possession of a firearm. What's the correlation? I believe that the underlying standard is the same or at least analogous. Fernandez-Ruiz relied itself on the Court's decision in Leocal. There's a train of cases going back in which the standards applied to crimes of violence in the context of prior convictions overlap from the immigration context to the sentencing enhancement context. Do you have any authority for the – I know you're making an analogy, but do you have any authority for the analogy or is it you're just reasoning that way? There is a line of cases. I don't have them at my fingertips. I would start by going from Fernandez-Ruiz back to Leocal. Leocal relied on a long line of cases. It focused on the – excuse me – the intent, specific intent issue. Fernandez-Ruiz takes that a step further and says that the same rules apply to recklessness as intent. Thank you. Yep. Good morning. I'm Frank Papagni. I was the prosecutor in this case dealing with Judge Smith's last questions regarding Mr. Weintraub's recent letter. The defendant's case was charged and accepted record – government's accepted record 108 clearly indicates the defendant was charged with a specific intent of knowingly committing assault in the third degree. Now, some of us older Oregon lawyers know that the Assault Free Statute has changed quite a bit, and the Leocal case left open the question whether or not recklessly would be sufficient to be a crime of violence or a predicate offense, be it under 18 U.S.C. Section 16 or under the Sentencing Guidelines sections that were used to enhance his sentence here. So that question is left open. And Ruiz-Fernandez, Judge Bia, decided that, I think it was an embanked decision, said recklessly is not going to be considered a crime of violence and you can't use that type of conviction to enhance a person's sentence. So let's look at what he was convicted of, what Judge Hogan had in front of him when he sentenced him. What Judge Hogan had in front of him was a copy of the indictment, which is part of the record. He had the judgment showing he pled guilty to it. And Mr. Conley, with another man, had assaulted an individual and was convicted of that. He pled guilty to it. Under Oregon law, knowingly is defined as an awareness of one's conduct. So clearly, it's a greater standard of proof for mens rea purposes than recklessly. And therefore, the issue Mr. Weintraub attempts to raise I don't think is a good one under that regard. By the way ---- I haven't looked at the indictment here that you've described. But are you saying that as a matter of judicially noticeable documents, we can determine as a matter of fact that he pled or he was convicted of a categorical crime that fits within crime of violence? Okay. Judge Fisher? Or are you saying under the Taylor analysis, are you saying that the crime itself as charged is categorically a crime of violence? Judge Fisher, this issue comes up constantly. I know. You look at the Oregon ---- We have it all the time. Look at the Oregon statute. And it's kind of interesting what the legislature in Oregon has done with it. You have three provisions which don't apply here that say if you recklessly do something, that can be assault in the third degree. Those provisions have been around since 1971 when Oregon adopted the criminal code. Then they changed it. Now you've got four provisions that say you can commit an assault in the third degree either intentionally or knowingly. In this instance, one of those provisions is what was charged. And we know that. And the court can take judicial notice of it because it's part of the record here, because the government as well as the defense offered the indictment to Judge Hogan at the time of the sentencing. That was an issue we argued about. Interesting enough to finish up on the new statute we have here in Oregon, I say new. It was changed in 2001. We also have three provisions that say you can commit an assault in the third degree intentionally, knowingly, or recklessly. Now, as an old prosecutor, I never have understood why you give me three choices. I'm always going to choose the easiest one to prove. But be that as it may, in this case, we have knowingly pled. Now, to your question, Judge Fischer, do we take a categorical approach? I don't think we can. I think you have to take the modified categorical approach used in Taylor. You have to look at the pleading document here, which we have, and which this Court has made very clear, as has other courts made since Shepard was decided, what you can and can't look at. But we can look at the charging instrument. You got it. You can look at the judgment. He pled guilty to it. You can't look at the pre-sentence report. I know all that. I'm just trying to understand. Are you saying the indictment on its face rules out the recklessly aspect? Yes. Because of which subsection it charged? Correct. It charges subsection F, which says it's either intentional or knowing conduct. And Mr. Weintraub's argument is you can't consider it if it's reckless. Well, it's not been charged that way. So assuming you get to that question, assuming he's preserved the issue, the government would submit that it's really a non-issue here, properly raised in some respects, but I wanted to deal with that first. Then we have the issue that the Court spent some time with Mr. Weintraub as did Judge Hogan, and that is what do we have here that indicates the officer's had sufficient exigent circumstances to go through that door? What were the exigent circumstances? Well, what you have here, as Judge Smith pointed out, Judge Goodwin, is the situation where you have a citizen reporting a crime immediately occurring. And ironically enough, the officer, the young officer, year of experience, he's standing taking a report from another victim of a recent burglary. The shed in his backyard that actually is on the property of the Yellow House had been broken into and an air compressor taken. So while he's standing there, a citizen drives by and says, someone just kicked in or broke into the door next or the residence next door. Now, you look at Mr. Crenshaw's statement, and I disagree with Mr. Weintraub, an excerpt of Record 41 through 43, Mr. Weintraub's excerpt, Mr. Crenshaw makes clear that he told the officer, excerpt of Record 43, yeah, I told him, referring to the officer, he went through the front door, either broke it down or kicked it in, I'm not sure which. Counsel, can I just follow up on something, though? Mr. Weintraub's point is, among others, that these officers were part of a small-town police department. Everybody kind of knows what's going on in a small town, and certainly in a small-town police department. And he's saying that the knowledge of Sergeant Martinez and Officer Randleman, they should have imputed to them the knowledge that the police department had, that it was, in fact, the police themselves that had kicked in the door. If you take away the door, the violence to the door, it kind of eats away at the circumstances a little bit, don't you think? If the officers knew that. We spent quite a bit of time at this hearing as you go through the excerpt of Record. I made it a point of going through that. In my opening statement to Judge Hogan, I said, we have Officer Katt, a man with a size 10 foot who kicked open the door a few weeks earlier, okay? And we're willing to go ahead and show the court, prove to the court, that these two officers have no knowledge of that. The other thing is, is that Mr. Crenshaw testified that the door had been broken in a couple times. I mean, I don't want the court to think this was the only time. This was somewhat a reoccurring event at this residence, which was considered a drug house and the home of burglars and thieves. In that very point, though, if that was a regular event and the door was regularly kicked in and they knew it, would that not take a little of the exigency away from this? Yes. So let's assume that they knew this was a drug house, as I think the Record shows, and that the door was and the house was regularly battered a bit. How could they then rely upon the fact that this had happened, even though the neighbor told them that, to think that there was an emergency going on in the house? The timing. When we look at exigent circumstances, it's the timing. The courts have made it very clear that if you've got an exigent circumstance and you're a police officer and you wait around four or five hours and then go into the house and say, gee, we didn't need a warrant because we had exigent circumstances, that doesn't cut it. However, in this instance, the officer is standing there. He's getting a report of a recent burglary. You have a citizen who comes up, and initially there was a claim the officer had used this as a pretext. We established, of course, when we located Mr. Crenshaw, it was not. And he says, it has just been done. Someone either kicked or broke in the door of that home. Now, that's not how you normally enter a house. And most of us, after our doors have been kicked in, whether it be for an emergency personnel helping us get someone through an ambulance or not, you fix the door, at least hammer it back up. And if you look at the photographs, you can see that there have been efforts in the past to repair the door by using nails rather than screws on the hinges or trying to go ahead and nail it shut. In fact, I think even Ms. Roble has testified to that at one point. So simply say because it's been kicked in before, and somehow the officer is supposed to assume that takes away from the exigency when you have someone saying it has just happened. That's why, Judge Smith, I think you asked the question, how many minutes does it take? The young officer goes immediately to the scene. He doesn't hang around. He leaves Mr. Smith after he gets the report. He stands on the corner. He calls his sergeant. The sergeant arrives within a minute. We verify the door looks like it's been kicked in. And then Judge Fisher made a point that makes it really interesting, is that when they go to the door, the door is cockeyed. You can look into the residence, and someone had to put a recliner up against it. That corroborates the tip that you just received. The background of the house, of course, helps you understand why this home is someplace where you might be concerned about your personal safety. And more importantly, from what Judge Fisher has talked about in an earlier decision that he wrote in dissent that was affirmed by the Supreme Court relying upon his dissent, the officers not. They announced. They said why they were there. They did it twice, according to Sergeant Martinez's testimony. This isn't where the police come charging in trying to use a pretext. He did it like you should. He even had a procedure that he'd been trained to do, unlike the young officer who was smart enough to get the sergeant there. They go inside with their guns drawn. Even inside, before he goes down the hallway, he says it again, loudly announcing, we're going to assume you're armed. What about the search of the closet? That's the more interesting one, and that's the one that I wanted to finish up with, because Sergeant Martinez talks about, and I accept your record, page 142. The sergeant goes into the bedroom. There's been no response from Mr. Connelly, saying, hey, I'm in here. Just a second. And he says he's asleep. He doesn't look asleep. And the sergeant recognizes an individual he's dealt with before. That's the case. Now we have somebody who's closed the loop, at least objectively, reasonably, on the notion that there was somebody inside the house. Now we know who was inside the house, who could have pushed the thing back. And then that sole individual is incapacitated both physically and moved away from the closet. That's why it wasn't the sergeant. But making it a bit more interesting and more factual specific, which we want to look to before we let officers go around the Fourth Amendment, if you will, is on page 142, Martinez says, when he entered the room, and when he was sitting on the mattress, he wasn't laying on the mattress. He was sitting. And he claimed he was sleeping. And where was he looking, I ask? Martinez says, he was looking toward the closet. He was looking. That's the way he was facing. Right. And he says, actually, at that point, he was looking at me, but he was facing towards the closet. Well, but he goes on to testify that he was feeling around to see if somebody could be hiding in there. Correct. And that's why I spent special pains to have young officer Randout in his training, that they even taught how people, in fact, even if it occurred in his training, someone could hide underneath a sheet. And we have people hiding in closets and cupboards. In fact, in the Bowie case, interestingly enough, the Supreme Court specifically referred to closets as being a place that the officers could protectively sleep. I understand that. But if you look at the photograph, it looks like there's a videotape that's in the picture there. And if that gives you any sense of scale, this looks like a very, very tiny closet to begin with, very shallow. And the likelihood of anybody being hiding in there seems pretty far-fetched. Well, Judge Fisher, that was the concern, and I think that raised the issue of this case. And Judge Hogan thought so, too. And that's why we spent a lot of time talking about it. And Judge Hogan made it a point of saying, you know, if you're in a courtroom like this one, then maybe I would probably say to the officer, you know, you shouldn't have looked there. But, Judge Fisher, we're not in a courtroom. We're going into a home where someone has kicked open the door, has not answered your announcements. The person you see in the bedroom is looking toward the direction of the closet. He's a felon you've dealt with before. What's the exigent circumstance anymore? The exigent circumstance? There is no indication that he was alone. And if the door has been kicked in or broken in, Mr. Connelly purportedly has a crutch and hobbles over to him, what makes this court or any court think that he could have been by himself? Sometimes there's more than one person in the room. That is so significant when you walk into a home with your guns drawn and you find someone in there that you think might be committing a crime or a burglary. Well, the person who left, I thought the officer identified as the owner. Well, I was interested. Lease or owner, we don't know what she is. And I made a point of saying I wasn't saying whether she was credible or not. That was the court's call. But the point here, Judge Fisher, is that when the officer reached over to the closet, he just reached to feel if someone was under the clothing. And it's a judgment call that anyone can make. But I think according to what I understand the law to be, we look at it whether or not there was a basis from the officer's point of view and in the circumstances. And we're not taking a lot of time to go ahead and say that we went into other rooms, which they later did, by the way. All right. I think we have your time. Thank you. And I think my time is up. Thank you, Your Honor. I'll give Mr. Weintraub a minute for rebuttal. All I would say is I believe the court is focusing on the correct issues. I would focus on once the police are in the house first. Because I really believe the critical point is once they identify Mr. Conley on the mattress and can see that he tells them and they can see that he has permission to be there, that it should have stopped there. Okay. I want to follow up just since you've got a little bit of time here. We talked a little bit before about the timing. Yes. Once they got in the house, one of the issues about the photograph and so on is the timing. If this happened very quickly, our ability to look at this in the calm of the courtroom is a little different than the officers with the guns drawn, particularly one of them being a rookie. How long did it take, according to the record, Mr. Weintraub, from the time that the officers spoke to Conley, went around, and checked in the closet? Is there anything in the record that speaks to that? It could have literally been as little as a minute. Okay. I would say that what that reflects is that the police went too fast here. They should have talked to Mr. Conley more. They could have stopped and read the note. Instead, they detained him at gunpoint and took him out of the bedroom. If we're talking about a buoy search, he wasn't under arrest, or at least he shouldn't have been. He hadn't done anything wrong, at least as far as the police could see at that point. It all happened quickly. The point was made by counsel for the government that you don't know who else is in the house. They see him. They don't know who's there. They check in the closet, feel around there. If that all happened within a minute, does that change anything? I think the key word in Mr. Papagni's presentation was the word maybe. He said maybe there was somebody else there. The police had no information that somebody else could have been there. They did have a report that one person went in. That's what they had. And if two had gone in, Mr. Crenshaw would have seen two going in instead of one and would have reported that to Officer Randleman. Thank you very much. Thank you. Appreciate counsel's argument. Case argued as submitted.
judges: Goodwin, O'scannlain, Fisher